IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 14, 2009

## JEFFERY YATES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 02-00754     James C. Beasley, Jr., Judge**

---

**No. W2008-02498-CCA-R3-PC   -   Filed September 18, 2009**

---

The petitioner, Jeffery Yates, was convicted of aggravated robbery and sentenced as a career offender to confinement for thirty years at sixty percent. Following his unsuccessful appeal of his conviction, he filed a petition for post-conviction relief, alleging that trial and appellate counsel were ineffective. After an evidentiary hearing, the post-conviction court determined that the petition was without merit, and we affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Jerri D. Mauldin, Memphis, Tennessee, for the appellant, Jeffery Yates.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In the direct appeal, this court set out the facts which were the basis for the conviction:

The victim of the aggravated robbery in this case, Chandera McCracken, testified that, on the night of August 24, 2001, she was living with her boyfriend, Leremy Bogard. Mr. Bogard's brother, Pinkie Wilson, also stayed there frequently. On the night in question, however, Ms. McCracken was alone. At about eleven o'clock that evening, Ms. McCracken heard a knock on the front door. She looked through the peep hole and observed a man she knew named Mike Key. Mr. Key asked her if a girl named Alicia stayed there. Ms. McCracken responded in the negative and Mr. Key left.

Ms. McCracken resumed her household chores and then lay down on the couch. She fell asleep and was awakened an hour or two later by "a big pounding on the door." Two men came in through the door and Ms. McCracken "woke up to a gun in [her] face," held by Mr. Key. Mr. Key told her, "You better tell me where the dope money – I'll kill you, weak-ass nigger. Where the shit at?" As Mr. Key accosted her, his cohort was going through other rooms in the house. Mr. Key grabbed Ms. McCracken around the neck and took her into the bedroom where his accomplice was. Ms. McCracken testified that this other man was wearing a bandana around the lower half of his face, covering "an inch of the nose." Nevertheless, she recognized him as a friend of her friend Shamere Talley. Ms. McCracken identified this individual at trial as the [petitioner].

Mr. Key demanded that she show them where the "dope" was and she directed them to a closet in the bedroom. From the closet, the men retrieved some cocaine, some money, and a coat. Mr. Key then threw Ms. McCracken face down across the bed. Ms. McCracken testified that the [petitioner] said, "You need to tie her m* * * *r-f* * * * *g ass up. We're gonna kill her ass." Mr. Key then duct-taped Ms. McCracken's hands and feet together and one of the men pulled her pants down. As she continued to lay on the bed, she heard the two men running through the house. Mr. Key periodically returned to the bedroom and threatened to shoot her if she moved.

About forty-five minutes after the break-in occurred, Mr. Wilson returned home. Ms. McCracken heard him pull into the driveway and then heard the [petitioner] and Mr. Key leave the house through the back door. Mr. Wilson entered the house and found Ms. McCracken. He untaped her and they went next door to call the police.

After the police arrived, Ms. McCracken told them that one of her assailants was Mike Key. She also showed them where Mr. Key's mother lived, which was nearby. She told them that she knew of the other suspect, but she did not at that time know his name. The police officers took photographs of the front door, disturbed furniture, and the duct tape with which she had been bound. On September 3, 2001, Ms. McCracken viewed a photographic array containing Mr. Key's photograph, and she identified him as one of her assailants. She also viewed another array containing the [petitioner]'s photograph, and she identified him as her other assailant.

Ms. McCracken stated that she had seen the [petitioner] three or four times before the break-in. She recognized him during the offense because of his eyes, his build, his height, and his complexion.

On cross-examination, Ms. McCracken admitted to having pled guilty in May 2002 to theft of property under $500. She further admitted that she obtained the [petitioner]'s name from a girlfriend before she identified him to the police.

-2-

Pinkie Wilson testified that, on the night in question, he went to a high school football game and then to a friend's house. He returned home between twelve-thirty and one o'clock that morning. When he got home, he saw that the front door had been kicked in, with the deadbolt still in the locked position. When he went in, he found Ms. McCracken "lying on the bed taped up." Her pants had been pulled down and she was crying. The house was also in disarray, with "everything . . . on the floor and stuff." The back door was open. Mr. Wilson freed Ms. McCracken and they then went next door, where he called the police.

Officer Alvin Peppers testified that he collected the evidence at the crime scene. When he arrived, he noticed that the front door appeared to have been kicked in, as it had shoe prints on it. The locking mechanism was in place, the door facing was laying on the floor, and there was extensive damage to the door. The house appeared to have been ransacked, with items of furniture overturned and the rooms in disarray. He took several photographs of the scene, but determined that there were no good surfaces from which to collect fingerprints. He collected the duct tape with which the victim had been bound.

Lieutenant Jeffrey Polk testified that he met with the victim on September 3, 2001, and took her statement. He also presented her with a photographic array containing the [petitioner]'s photograph. He stated that the victim had called him the day before and provided him with the [petitioner]'s name. The photographic array contained six photographs. The victim used a sheet of paper to cover the lower half of the subjects' faces while she viewed the array. She then identified the [petitioner]. Lt. Polk stated that Ms. McCracken was "firm" in her identification.

Lt. Polk first spoke with Ms. McCracken on the day of the crime. When he asked her about the circumstances surrounding the robbery, she initially told him that her boyfriend sometimes sold drugs. She then "became reluctant to go forward . . . and told [him] there was too much confusion about all of this." About a week later, Ms. McCracken contacted him and told him that she wanted to prosecute. She also gave him the [petitioner]'s name.

Upon determining that the suspects were Michael Key and the [petitioner], Lt. Polk obtained warrants for their arrests on September 11, 2001. He distributed a "broadcast" to uniform patrol containing the suspects' last-known addresses, physical descriptions and photographs in an effort to apprehend them. Michael Key was arrested on October 3, 2001, and Lt. Polk interviewed him the next day. Mr. Key gave a written statement at that time.

On cross-examination, Lt. Polk acknowledged that Ms. McCracken initially described the second assailant to the reporting officers as a black male, about twenty-two years old, five feet eleven inches tall, slim build, "bright-skinned" wearing a "doo-rag" on his head, black jeans, black T-shirt, and a black bandana tied below his eyes. She also told the officers that this second assailant had not been

-3-

armed. When Lt. Polk spoke with her directly the first time, she gave him Michael Key's name but did not give him the [petitioner]'s name or state that she knew him. She also stated during this initial conversation that money and a jacket had been stolen, but did not state that drugs had been stolen.

Officer Jonas Holgoin testified that, on the night of September 21, 2001, he was working on a prostitution sting operation. The operation involved a female undercover officer agreeing to provide sex for money to a customer. The agreement was reached in the front of a hotel and the customer was then sent to the rear of the hotel. Officer Holgoin was waiting in the parking lot to "takedown" the customers as they made their way to the back of the hotel. Officer Holgoin and Detective Boyce were notified to take down a particular black male and as they began to do so, the suspect looked at them, turned, and jumped a wooden fence. The officers announced who they were and gave chase. They jumped the fence and found themselves in a thickly wooded area. They continued to chase the suspect for an hour to an hour and a half.

Eventually, Officer Holgoin was able to grab the suspect by the leg and a struggle ensued during which the suspect struck Officer Holgoin in the head. Officer Holgoin testified that "[i]t was very difficult to take him into custody." Officer Holgoin was eventually able to handcuff the suspect. Officer Holgoin identified the [petitioner] at trial as the suspect that he captured.

On cross-examination, Officer Holgoin acknowledged that he had not been looking for the [petitioner] that night. He chased the [petitioner] because he was identified as a suspect in the prostitution sting, not because of an arrest warrant concerning the robbery. Officer Holgoin did not find out about the arrest warrant until after he had taken the [petitioner] into custody.

Trent Hall testified that he became Michael Key's attorney in October 2001. Mr. Key had been charged with aggravated robbery. Mr. Key indicated from the beginning that he wanted to plead guilty. Mr. Hall explained to him that, if he did so, he would be making himself available as a witness in the State's case against his co-defendant, Jeffrey Yates. Mr. Key understood and acknowledged this. The State offered Mr. Key a plea bargain involving a sentence of fifteen years with a release eligibility date of thirty-five percent. Mr. Key eventually pled guilty to aggravated robbery with an agreed sentence of twelve years and a release eligibility date of thirty-five percent. However, the plea agreement was not made in exchange for any promised testimony.

Michael Key testified that he was currently serving a sentence of twelve years at thirty-five percent for aggravated robbery. He acknowledged having been convicted of theft of property over $10,000 in 1999 and use of a firearm during a drug trafficking offense in 1993. He identified Ms. McCracken at trial as the woman he and the [petitioner] robbed in August 2001.

Mr. Key testified that he and the [petitioner] went to the victim's house on the night in question and he went to the door to see if someone was there. The [petitioner] did not accompany him to the door on this initial visit. It was the [petitioner]'s idea to go to that particular house; the [petitioner] told him that "they had a whole lot of drugs and some money there."

During the initial visit, Mr. Key went to the door and it was answered by the victim. He asked if a woman, whose name he could not remember, lived there, and the victim told him no. This initial visit was a ruse to determine who was in the house at the time. He returned to the truck where the [petitioner] was waiting and reported that the victim was in the house.

Mr. Key testified that they planned on returning to the house with some guns and demanding that the victim turn over the drugs and money. They planned on kicking the door in; during the actual break-in, they had to kick it about five times to get the door open. Mr. Key stated that he and the [petitioner] each had a gun. They went in and the victim was hollering. Mr. Key grabbed her and told her to "lay down." They asked for the drugs and money. Mr. Key testified that he had a shirt covering his face and the [petitioner] was wearing a mask. The [petitioner] told Mr. Key to hold Ms. McCracken. While Mr. Key did so, the [petitioner] got some duct tape and told Mr. Key to take Ms. McCracken to the bedroom. Once there, they tied her up with the duct tape at the [petitioner]'s direction.

Before they tied up the victim, Mr. Key asked her for the money and the drugs. She produced a vase which contained twelve rocks of cocaine. The [petitioner] took these drugs. Mr. Key stated that there was no money. The [petitioner] also took a jacket and put it on. After they tied Ms. McCracken, they continued looking through the house for drugs and money. The [petitioner] found some wheel rims that he put on a blanket to steal, but they heard someone drive up and the [petitioner] did not have time to take the rims. The two men ran out the back door. The only thing that Mr. Key took with him was the gun and the roll of duct tape. Mr. Key testified that he got the gun that he used that night from the [petitioner].

Mr. Key stated that he was arrested for this crime on October 3, 2001. The next day, he spoke with the police and agreed to make a statement. He told them about the robbery and stated that the [petitioner] had been his accomplice. No one made him any promises in return for his statement. He subsequently pled guilty as charged and received an agreed-upon sentence of twelve years. He received no deals in exchange for his plea.

On cross-examination, Mr. Key stated that he had never seen the victim before the night of the crime. He maintained that the [petitioner] directed the execution of the crime.

The [petitioner] testified, stating that he was not with Michael Key on the night of the robbery. On cross-examination, the [petitioner] admitted having been convicted of five counts of aggravated assault, two counts of possession of a controlled substance with intent to sell, one count of attempted aggravated robbery, one count of especially aggravated kidnapping and one count of aggravated kidnapping. However, the [petitioner] claimed that these convictions had been reversed on post-conviction and remanded for a new trial.

On rebuttal, Kimberly Tanzy, the criminal court deputy court clerk, testified that all of the [petitioner]'s convictions about which he had been cross-examined were still valid and had not been reversed.

State v. Jeffery Yates, No. W2003-02422-CCA-MR3-CD, 2005 WL 1707974, at **1-5 (Tenn. Crim. App. July 21, 2005), perm. to appeal denied (Tenn. Dec. 19, 2005).

The petitioner filed a *pro se* petition for post-conviction relief and a second amended petition. After counsel was appointed to represent the petitioner, an amended petition was filed. That petition alleged trial counsel was ineffective because he failed to fully investigate the case; failed to meaningfully confer with the petitioner regarding any defenses; failed to pursue possible violations of the petitioner's constitutional rights; because of disciplinary complaints filed by the petitioner against trial counsel, failed to zealously represent the petitioner; failed to properly represent the petitioner during the trial; failed to call alibi witnesses; and failed to notify the trial court that the petitioner's prior convictions were void and could not be considered for sentencing purposes. Additionally, the petition alleged that the trial court erred in application of the enhancement factors and that appellate counsel was ineffective for not raising all of the issues which had been raised by trial counsel.

At the evidentiary hearing, the petitioner testified that trial counsel only met with him "two or three times prior to trial." He said he wrote letters to counsel, but counsel did not respond. He said that his family provided counsel with "all this information," including the police reports. The petitioner said that he believed his case would have been "more sufficiently tried" if counsel had "paid a little more attention" to his case and had consulted with him more. He said that trial counsel advised him not to testify at trial, but he chose to testify anyway. He said he testified that he was not present when the robbery was committed.

The petitioner said that trial counsel did not discuss the defense with him or file any pretrial motions, which resulted in the petitioner's filing "ten or fifteen" disciplinary complaints against counsel. The petitioner said he had wanted counsel to file a motion in limine "because testimony was used in [his] trial in a separate arrest that had nothing to do with the charges that [he] was on trial with[.]" The petitioner said that the jury was instructed on "flight" and that "they had the jury believing that I ran because I had a warrant or I knowed I did something wrong, and I feel that I was prejudiced, but if [trial counsel] would have filed the motion in limine [he] could have addressed it to the Court and a ruling could have been made." According to the petitioner, that charge was later dismissed. The petitioner said counsel should have filed a motion to suppress the victim's identification of him because it was "suggestive."

-6-

The petitioner said he gave counsel the names of two alibi witnesses, Shamere Talley and Ashley Talley, who would have testified that they did not tell the victim that the petitioner was with the co-defendant. However, the witnesses told counsel they "had no knowledge of the case" which, according to the petitioner, was "false." The petitioner said that the witnesses would have testified that the victim was untruthful when she said she had seen the petitioner at Shamere Talley's house on three or four occasions.

The petitioner said that, at the preliminary hearing, the co-defendant "got up in court and told them that I was not with him but his attorney . . . told him be quiet." The petitioner said he asked trial counsel for a copy of the transcript of the hearing, but he never received one.

The petitioner claimed that trial counsel failed to put forth his theory of the case, saying that he told counsel about the situation with Tosha Talley's boyfriend being mad at him, but counsel got it confused with Shamere Talley. According to the petitioner, Tosha Talley came to the preliminary hearing with the victim, identified him to the victim, and told the victim that he was the one involved in the robbery with the co-defendant. The petitioner said that neither Tosha nor Shamere Talley testified at trial.

The petitioner said that trial counsel never gave him a copy of his presentence report and that the report contained errors. He said that his prior convictions should not have been used to enhance his sentence because they were ordered to be served concurrently.

The petitioner testified that the only time he saw appellate counsel was when counsel was appointed to represent him on another charge. The petitioner said he "was denied for appeal because the sentencing issue that was objected to on a motion for a new trial [trial counsel] didn't object to it during the trial phase. And the motion to withdraw [as] counsel during trial in front of the jury I feel it should have been raised because [trial counsel] felt it was a conflict of interest and I felt it was a conflict of interest."

Trial counsel testified that he had been licensed to practice law for fifteen to sixteen years and had practiced criminal law the entire time. He said that he was a certified criminal trial specialist and licensed to handle capital cases. He said that he was appointed to represent the petitioner in May 2002 and that his relationship with the petitioner was "very difficult from the beginning." After the petitioner told counsel that he previously had suffered a gunshot wound to the head, counsel thought maybe that was why the petitioner could not understand him and had a mental evaluation performed on the petitioner which showed he was competent to stand trial. Counsel said that he met with the petitioner approximately thirteen times and that the petitioner only wanted to discuss his prior convictions.

Trial counsel acknowledged that the petitioner asked him about the preliminary hearing transcript and said that one of his letters to the petitioner referenced the transcript.[1] Counsel said that he no longer had a copy of the transcript and may have given it to appellate counsel. Counsel said he did not believe the co-defendant testified at the preliminary hearing and added, "[E]very time I go to trial if there's a preliminary hearing that's been done[,] the tape is gotten and it is transcribed so I can use [it] in the cross examination – every trial I've ever done. There's never been one that I haven't done."

Trial counsel said he started receiving complaints in June 2002 and filed his first request to withdraw from the petitioner's case in July 2002. He said the petitioner complained that he was not turning over discovery to him and kept bringing up the issue about his prior convictions. He said he wrote letters to the petitioner and provided him with a copy of his file four or five times. Trial counsel identified his letter to the petitioner dated September 26, 2002, wherein he informed the petitioner of the outcome of his direct appeal and the appeal of his post-conviction petition. Counsel also identified his letter of January 14, 2003, to the petitioner asking for the names of witnesses and for an explanation for the co-defendant's statement that the petitioner had helped him in the robbery. The petitioner wrote counsel on January 23, again complaining that he had not received any discovery. Counsel informed the petitioner that he had sent him all of the discovery documents. Counsel said he reviewed every suppression issue and did not believe there was a valid motion in the victim's identification or the petitioner's prostitution arrest.

Trial counsel said the petitioner eventually provided him with the names of some witnesses, but he did not call the witnesses at trial because everyone he spoke to "couldn't stand [the petitioner], said he was pretty much a menace to the neighborhood and was a thug and they wouldn't come in . . . and testify on behalf of [the petitioner] because they want[ed] him out of their neighborhood." Counsel recalled the situation with Shamere and Ashley Talley and remembered speaking to some female witnesses and said if "those were the names [the petitioner] gave me, I spoke to them." Counsel said he did not believe the situation with the Talleys was a viable defense at trial because it was his understanding that the petitioner and another man had been robbing people in the neighborhood.

Trial counsel said that, by the time of trial, the petitioner would not speak to him and that he "literally spent the whole trial with [the petitioner] not telling me anything or what he was going to do, but he had this master mind thing that he knew more than I did and was going to testify during trial." Counsel asked the petitioner what he planned to say, and the petitioner replied, "[Y]ou'll hear what I'm going to say when I get out there and testify." He said the only time the petitioner told him his version of what had happened was "in the five minutes before he was going to go out and testify." Counsel said he begged the petitioner not to testify because he had a "horrible record."

---

[1] Counsel's letter to the petitioner dated February 10, 2003, states that he had requested a tape of the preliminary hearing but that the State had not finished the copy. Counsel informed the petitioner that when he received a copy, he would either allow the petitioner to listen to the tape or provide him with a transcript.

Trial counsel said that the petitioner was untruthful during his testimony, which caused him to ask for a recess in order to call the Board of Professional Responsibility for guidance. Counsel then asked to withdraw from the case, but the trial court denied his motion, as well as his requests for an interlocutory appeal and for a continuance. He said that the only thing he was ethically permitted to do at that point was to inform the petitioner to tell his side of the story to the jury. When the petitioner was asked about his prior convictions on cross-examination, he denied having been convicted of them. The State then had the court clerk read every jacket of every conviction into the record.

Trial counsel said that, as he was leaving the courthouse after trial, three jurors approached him and told him that "neither one of the State's witnesses [was] credible at all. If your client would have stayed off the witness stand[,] we would never have convicted him."

Appellate counsel testified that he had been licensed to practice law since 2003 and that he represented the petitioner on appeal and on a trial court matter. Counsel said he met with the petitioner in jail on two occasions, for a total of two hours, on the appellate case. Counsel also visited the petitioner monthly, if not weekly, on the trial court matter, during which meetings counsel "probably" discussed the appellate case with the petitioner as well. The petitioner filed a disciplinary complaint against appellate counsel after counsel filed the appeal. Counsel acknowledged that he did not include all of the motion for new trial issues in his appellate brief, saying that the first six issues had merit but that the remaining issues pertained to the petitioner's "acrimonious relationship" with trial counsel which appellate counsel did not think were appropriate for the appellate brief. Counsel said he responded to every letter the petitioner wrote him.

## ANALYSIS

On appeal, the petitioner has presented a grab bag of complaints against trial and appellate counsel.

### I. Ineffectiveness of Trial Counsel

### A. Failure to Fully Investigate the Case, including Not Obtaining Transcripts of the Preliminary Hearing

The petitioner asserts that trial counsel was ineffective for not obtaining the transcript of the preliminary hearing because the transcript could have "been used to impeach the co-defendant when he testified against [the petitioner] at trial and could have placed doubt in the minds of the jurors as to [the co-defendant's] credibility."

Although making this general argument, the petitioner has failed to detail preliminary hearing testimony which, in his view, trial counsel might have utilized or portions of the trial transcript showing where counsel might have utilized the preliminary hearing testimony. Accordingly, we

agree with the post-conviction court that the petitioner failed to prove this claim that trial counsel was ineffective.

### B. Failure to Confer with Petitioner Prior to Trial,
### Visiting Him Only Two or Three Times

On appeal, the petitioner complains that the few meetings he had with counsel prior to trial were brief. He claims that counsel did not adequately question him during direct examination or fully argue the case to the jury.

The post-conviction court found that trial counsel had met with the petitioner on "numerous occasions":

> But I'm satisfied from [trial counsel's] testimony that he met with [the petitioner] on numerous occasions. I believe he testified – I had somewhere in here I thought where he had met with him nine or ten times attempting to discuss these issues with him and was never getting anywhere when they would get into these discussions about his priors. I'll have to let the record reflect actually what he testified to.

> Yes. He said he met with the [petitioner] nine to ten times and more – nine to ten times I think maybe he said in court and more times over in the jail. So I'm satisfied that [trial counsel] did an effort to try to communicate with the [petitioner], and that he did confer with and attempt to confer with [the petitioner], and if he failed in that, it was because of [the petitioner's] failure to cooperate with him.

The record supports the determination of the post-conviction court that there were numerous meetings between trial counsel and the petitioner. As for the claims that trial counsel should have questioned him differently during his testimony or more fully argued the case to the jury, the petitioner made only these broad allegations, without explaining them in any fashion. Accordingly, we agree with the post-conviction court that the petitioner failed to carry the burden of proof as to these claims.

### C. Failure to Pursue Possible Violations of Petitioner's Constitutional Rights

The petitioner argues that counsel should have filed a motion in limine regarding the petitioner's arrest on a prostitution charge, a motion asserting that his arrest on the charge was unconstitutional, and a motion to suppress his identification by the victim.

The post-conviction court found that these claims were without merit:

> There's an issue about whether or not he should have filed motions in limine regarding the arrest and the identification. [Trial counsel] testified that he did not file a motion in limine but he objected and litigated quite extensively the issue on the arrest. The testimony was that [the petitioner] was arrested in a prostitution sting,

fled from the police and that he was not arrested because of this case but that it was a side issue and that the [S]tate argued and [trial counsel] vigorously objected to it that the [S]tate was arguing because of guilty knowledge he was attempting to flee in the prostitution issue because of this case.

And [trial counsel] fought that issue but was overruled by the trial court and that ruling was upheld by the appellate court, and as to the motion to suppress the identification, he testified that he didn't think there was a valid argument with regard to the validity of the photo-array, the photo-lineup, and therefore he didn't raise it, plus further he felt his trial strategy would be weakened if the victim were allowed to bolster her identification by identifying the [petitioner] in a motion to suppress, especially, when he didn't think that it had any merit because . . . there was nothing suggestive or improper about the photo-array and that he preferred to be able to cross-examine the victim with regard to that in front of a jury.

And apparently he did quite an extensive job of doing that as pointed out again by the appellate court in the opinion of the appeal of [the] matter. So he's explained those and I find those arguments to be satisfactory, and I do not find they are in any way [a] violation of [the petitioner's] rights about not filing those things. I think [trial counsel] adequately protected [the petitioner's] rights in the way he litigated and argued those particular issues with regard to the arrest in the prostitution and subsequent flight charge and the identification procedure used in this case.

Other than making these broad claims, the petitioner did not attempt to explain the basis for the motion in limine which he believes should have been filed, why the charge of prostitution was unconstitutional, or the basis for a motion to suppress. Accordingly, we concur with the post-conviction court that the petitioner failed to carry his burden of proof as to these claims.

### D. Failure to Zealously Represent the Petitioner Because of Disciplinary Complaints Filed by Petitioner Against Counsel

The petitioner filed disciplinary complaints against trial counsel during the period counsel represented the petitioner regarding counsel's failure to communicate with him and lack of preparation for the trial.

The post-conviction court found this claim to be without merit:

The allegation that [trial counsel] failed to zealously represent the [petitioner] because of numerous bar complaints, . . . frankly it would be real easy for an attorney such as [trial counsel] to come in here and say that's right. You know I didn't like the [petitioner]. We didn't get along. We couldn't communicate. He complained on me constantly. No, I just didn't do anything for him.

But [trial counsel], and again, this Court has watched [trial counsel] through the years as a trial attorney, and like a lot of really good trial attorneys, he has the

-11-

desire and the motivation to win even in the face of having a client who doesn't cooperate with him.

You know I commend trial lawyers for the ability to do that the desire to win your case on behalf of your client even if your client doesn't appreciate or like what you're doing. You know that's that edge that I think good trial lawyers have, and [trial counsel] testified to that . . . not withstanding [sic] everything, he still thought he tried a really good case, and he frankly was of the opinion that he won the case, and that I believe he stated to [the petitioner] in the hearing we had in here that if [the petitioner] had listened to him, he wouldn't be in jail today.

And frankly in reading the transcript of the trial and also the opinion of the court of criminal appeals, . . . I don't know what the jury would have done, but in light of what these jurors told [trial counsel], there may have been a possibility that that's correct that [trial counsel] may have tried a great case with an unwilling and uncooperative defendant and still may have possibly won it, but for [the petitioner's] trying to run the show and [the petitioner,] over [trial counsel's] objection[,] taking the witness stand and [the petitioner,] over [trial counsel's] objection[,] refusing to cooperate with him, and [the petitioner,] over [trial counsel's] objection[,] submitting himself to being cross-examined about his extensive prior criminal record because he got on the stand and denied those types of things.

So not withstanding [trial counsel's] attacks by [the petitioner], I find that he did zealously represent the [petitioner], and if the [petitioner] had listened to his attorney, he might not be filing this post-conviction petition. I don't find that that issue has any merit. I find [trial counsel] did represent [the petitioner] properly.

Again, the petitioner has made broad claims without detail or substance. We agree with the post-conviction court that the petitioner has failed to carry his burden of proof as to these claims.

### E. Failure to Effectively Cross-Examine Witnesses at Trial

In the petitioner's view, counsel's trial performance was deficient because he did not properly cross-examine the victim regarding inconsistencies or question the petitioner regarding his theory of the case. Additionally, the petitioner argues that counsel failed to cross-examine the co-defendant as to how well he knew the petitioner or to prevent the petitioner from being cross-examined about his prior convictions as he was testifying.

The post-conviction court found this claim to be without merit: "I think the trial transcript[] speaks for itself with regard to proper objections and cross-examination. I think that it is very clear that [trial counsel] cross-examined and objected at appropriate times and vigorously cross-examined the witnesses involved in this case."

We conclude that the record supports this determination by the post-conviction court.

## F. Failure to Call Witnesses Vital to the Defense

The petitioner argues that trial counsel failed to call as witnesses at trial Shamere and Ashley Talley. Counsel told the court that these witnesses had nothing to add, a statement which was false according to the petitioner.

The post-conviction court found this claim to be without merit:

> [Trial counsel] testified . . . that he failed to call alibi witnesses, the Tall[e]y girls. [Trial counsel] testified that first of all [the petitioner] wouldn't give him the name of anybody until right before trial and he finally gave him some names, and [trial counsel] testified that he and his investigator attempted to talk to these witnesses, and that all of the witnesses given to him by [the petitioner] were very much antagonistic, were very much anti[petitioner], were very much not going to be witnesses that would help or bolster [trial counsel's] defense of [the petitioner].

> I believe he testified that they all did not want to have anything positive to say about [the petitioner], and frankly they didn't like him, and they wanted him out of their neighborhood. I believe that's a paraphrase of what he said, but it was very derogatory. I do recall that, and that's why [trial counsel] did not put them on.

> All right. He said that everyone he spoke to or he or his investigator spoke to said they did not like the [petitioner]. They would not testify for him. They wanted him out of their neighborhood. So it appears that the names that [the petitioner] wanted called and tried to have called would not substantiate what it was that he was alleging.

Neither of these alleged helpful to the defense witnesses testified at the evidentiary hearing, leaving the post-conviction court to speculate as to what their testimony might have been. Accordingly, we concur with the post-conviction court that the petitioner failed to prove this claim.

## G. Failure to Advise the Trial Court that Prior Convictions Being Used for Sentencing Purposes Were Void

The petitioner argues that trial counsel failed to provide the petitioner with a copy of the presentence report, which contained numerous errors, and he should not have been cross-examined about his prior convictions because they had mistakenly been run concurrently.

The post-conviction court found that this claim was without merit:

> He says that [trial counsel] failed to alert the judge during sentencing to the fact that his prior judgments should have been void and not enforceable in this case, and again that is an issue that has been litigated. It is a matter of law and whether he did or did not raise that issue I think that it is not an issue because it had previously been determined to be not an issue by Courts of the State.

-13-

He alleges that [the trial court] misapplied the enhancement factors in determining he was a career offender. Again, that was litigated on appeal. The court of criminal appeals has ruled that it was proper and [the trial court's] analysis of the [petitioner's] record was proper and that he was in fact a career offender.

The record supports this determination by the post-conviction court.

## II.  Ineffectiveness of Appellate Counsel

### A.  Failure to Raise on Appeal Issues Which Were
### Raised by Trial Counsel at the Motion for New Trial

The petitioner argues that appellate counsel was ineffective for not raising all of the issues raised by trial counsel in the motion for new trial.

The post-conviction court found that this claim was without merit:  "He alleges that the appellate counsel, . . ., did not address all the issues raised by trial counsel.  I think based upon the testimony and review of the opinion of the court of criminal appeals I find that that issue has no merit."

The petitioner did not identify the additional issues which he believes should have been raised on appeal or show why the making of such arguments would have benefitted him. Accordingly, we conclude that the record supports the determination of the post-conviction court that the petitioner failed to prove these claims.

### B.  Failure to Respond to the Petitioner's Letters

The petitioner argues that appellate counsel was ineffective for not answering several letters that he wrote to counsel.

While this claim might be, and apparently was, the basis for a disciplinary claim against counsel, the petitioner made no attempt to show how he was prejudiced by the alleged non-responsiveness of counsel. We note, in fact, that appellate counsel testified that he answered every letter the petitioner wrote to him. Accordingly, the record supports the determination of the post-conviction court that the petitioner failed to prove this claim.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the dismissal of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-14-